This was a suit brought by the husband against the wife for the annulment of their marriage. The facts in the case are: The petitioner, Samuel Salzberg, is a citizen of the United States and forty-two years of age, born abroad, married abroad and has three children by a former marriage, two of whom were born abroad and one in the United States. He came to this country about sixteen years ago and was naturalized in Philadelphia in 1921. His first wife died and he was left with the three children, the oldest of whom is *Page 525 
eighteen years, the next sixteen years and the third about six years at the present time. At the time this suit was instituted he was a weaver working at Paterson, New Jersey. His first wife died about a year and a half prior to May, 1929. The petitioner met the defendant about December 12th, 1928, and they were married a day or two later. The defendant was about twenty-three years of age at the time. It appears from the evidence that one Marx Beregofsky kept a tailor shop in the city of Paterson, New Jersey, and that the petitioner with his children lived over the shop. On or about December 12th, 1928, the defendant and her mother called at the tailor shop and inquired of Beregofsky where a Mr. Wax lived. It appears that the defendant and her mother wished to see Mr. Wax for the purpose of obtaining a $500 bond which it was necessary for the defendant to procure because she was not a citizen of the United States and was about to be deported unless she furnished same. At this time, Samuel Salzberg, the petitioner, appeared in the tailor shop and the mother of the defendant told him the story. Thereupon Salzberg went with the defendant and her mother in search of Mr. Wax. The mother of the defendant asked the petitioner if he liked her daughter and if he would like to marry her. The defendant then stated that if she were "only a girl" she would not be able to take care of his three children. When the mother heard this statement she replied that her daughter was a woman and that she had a husband in China and a boy seven years old. The defendant then asked to see the petitioner's children and to go into his house. Thereupon the defendant stated that she wanted to marry the petitioner. She further said that if she married an American citizen she would be able to reside in this country. The next day the petitioner went to the house of the defendant and her mother and they told him that if he would marry the girl she would take good care of the children. Thereupon the petitioner agreed to marry the defendant and the marriage ceremony was performed on December 15th, 1928. According to the husband's statements the petitioner and defendant stayed at the home of defendant's mother for two *Page 526 
or three days after the marriage. They then consulted a lawyer and were advised that it would be necessary for them to go to Canada. The party, consisting of petitioner and defendant, Mr. Wax and his son and two others, started in an automobile for Canada. When they arrived in Buffalo deep snow was reported and they spent the night in Buffalo. The next day the petitioner and defendant, Mr. Wax and his son proceeded to Canada. After spending a day or two in Canada the petitioner gave the defendant some money and returned home, the defendant remaining in Canada. Two or three times thereafter the petitioner sent the defendant money and the defendant continued to make demands for more money while she remained in Canada for about three weeks. About four weeks after his return the petitioner received a telephone call from his wife stating that she was in Buffalo and told him that she couldn't return home and was going to stay there. Later he received another telephone message from his wife stating that she would be home in two or three days and a few days later she came to the home of the petitioner. The wife then went to the home of her mother and took the youngest child with her. The petitioner afterward took this child back to his home. He visited the home of the defendant on several occasions, they had some arguments about money and the defendant informed the petitioner that she would repay him everything that he had spent for her but that she would not live with him. The defendant refused to return and live with the petitioner. The defendant claimed that she wanted the petitioner to obtain other living quarters, which he failed to do. The petitioner admitted that he knew that the defendant would have to leave the country if she did not marry an American citizen, which appears from his testimony as follows: "Q. How many days before you were married did you first learn from your wife or someone else that your wife wanted to marry you for the purpose of remaining in this country? A. Two days before. Q.
Then you knew that your wife wanted to marry you for the purpose of remaining in this country? A. I knew it. She told me. Q.
So you knew two days before you married *Page 527 
that your wife was going to marry you for the purpose of remaining in this country? A. Yes."
It seems quite apparent from the evidence that no love could have entered into the marriage. It appears to have been a cold business-like proposition on the part of the parties. The wife, in order to remain in this country, wished to marry an American citizen and the husband wished to obtain someone to care for his children. There is a failure of proof of fraud for the reason that the petitioner admits he knew the motive of the wife two days prior to the marriage. The marriage took place and was consummated. There is nothing in the evidence which satisfactorily proves that either of the parties at the time the marriage ceremony was performed were misled by fraudulent statements or misrepresentations of one to the other. In order to determine what will constitute sufficient fraud to annul a marriage, regard must be had for the whole status of both parties and the circumstances which induced the contract. As a matter of fact it seems that each intended to fulfill their part of the agreement at the time the ceremony was performed although it appears that there was no affection between them before or at the time of marriage. A marriage cannot be annulled for the reason only that no love existed between the parties to the marriage at the time thereof. Such a procedure would be to establish a dangerous precedent and open the door to an easy method of setting aside marriage contracts. We are therefore of the opinion that there was not sufficient fraud shown on the part of the wife which induced the husband to marry her and which would satisfy the court in annulling the marriage.
The decree of the court of chancery is therefore reversed, with costs.
For affirmance — THE CHIEF JUSTICE, TRENCHARD, BODINE, DONGES, VAN BUSKIRK, DEAR, JJ. 6.
For reversal — PARKER, CAMPBELL, LLOYD, CASE, DALY, KAYS, HETFIELD, WELLS, JJ. 8. *Page 528